OAHU GAS SERVICE, INC., Plaintiff,

v.

PACIFIC RESOURCES, INC., and Gasco, Inc., Defendants.

Civ. No. 77–0444.

United States District Court, D. Hawaii.

Nov. 9, 1978.

As Amended Nov. 15, 1978.

A. Bernard Bays, Tom C. Ingledue, Ke-Ching Ning, Carlsmith, Carlsmith, Wichman & Case, Honolulu, Hawaii, for plaintiff.

John Sparks, Brobeck, Phleger & Harrison, San Francisco, Cal., Arthur B. Reinwald, Hoddick, Reinwald, O'Connor & Marrack, Honolulu, Hawaii, for defendants.

## DECISION ON MOTION TO DISMISS

### I. STATEMENT OF FACTS

SAMUEL P. KING, Chief Judge.

Plaintiff Oahu Gas Service, Inc. ("OGS") is a Hawaii corporation engaged in the business of selling and distributing liquid petroleum gas ("LP-gas"), commonly referred to as propane, on the island of Oahu. Defendants Pacific Resources, Inc. ("PRI") and Gasco, Inc. ("Gasco") are Hawaii corporations. Gasco is a wholly-owned subsidiary of PRI and is engaged in the business of selling and distributing petroleum products, including LP-gas and synthetic natural gas ("SN-gas"), in the State of Hawaii.[1]

On November 4, 1977, OGS filed a Complaint which alleges that Gasco, while under the direction and control of PRI, engaged in certain conduct and practices which violated federal and state antitrust and trade regulation statutes. OGS alleges that Gasco (a) intentionally monopolized trade and commerce in LP-gas and SN-gas in the State of Hawaii; (b) unreasonably restrained trade and commerce in these markets; (c) entered into illegal exclusive dealing and tying arrangements with its customers; and (d) engaged in price discrimination between purchasers of LP-gas of like grade.[2] OGS claims that Defendants' alleged activities caused severe injury to OGS' business and property, and seeks treble damages, injunctive relief, and reasonable attorney's fees and costs.

On January 16, 1978, PRI and Gasco (hereinafter collectively referred to as "Gasco") moved to dismiss the Complaint on the ground that OGS had failed to state claims upon which relief could be granted. More specifically, Gasco contends that the congressionally-created federal regulation of propane is so pervasive that a total or

1. Although the only named defendants are PRI and Gasco, OGS alleges that two other wholly-owned subsidiaries of PRI conspired with PRI and Gasco to commit the activities which provide the bases for this action. Complaint, ¶¶ 7–11 at 3.

2. The Complaint was filed under §§ 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. The monopolistic activities are alleged to be violations of § 2 of the Sherman Act, 15 U.S.C. § 2, and Haw.Rev.Stat. § 480–9.

Certain arrangements, contracts and combinations between Gasco and its customers are alleged to constitute unreasonable restraints of trade and commerce, in violation of § 1 of the Sherman Act, 15 U.S.C. § 1, and Haw.Rev.Stat. § 480–4. These same agreements are alleged to constitute illegal exclusive dealing arrangements and tying agreements in violation of § 3 of the Clayton Act, 15 U.S.C. § 14, and § 1 of the Sherman Act, 15 U.S.C. § 1 and Haw.Rev. Stat. §§ 480–4 and 480–5.

Gasco's activities involving cash payments or rebates, installation fees and charges, price reductions and varied price schedules are alleged to constitute price discrimination in violation of § 2 of the Clayton Act, as amended by § 1 of the Robinson-Patman Act, 15 U.S.C. § 13. All of the activities alleged in the Complaint are claimed to violate Chapter 481 of the Hawaii Revised Statutes, and to constitute unfair and deceptive acts or practices in the conduct of any trade or commerce, in violation of Haw. Rev.Stat. § 480–2.

"blanket" immunity from the antitrust laws must be implied.[3] Gasco's alternative argument is that even if a total or blanket immunity is inapplicable, most of the allegations in the Complaint must be stricken because the activities challenged therein are subject to *specific* agency regulation and are therefore immune from the antitrust laws. Gasco also asserts that insofar as any of its activities are subject to regulation by the Hawaii Public Utilities Commission ("PUC"), those activities are likewise exempt from antitrust scrutiny, under the "state action" exemption developed in *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), and subsequent cases. Finally, Gasco claims that its activities before the Federal Energy Administration, whereby Gasco sought and received an increased propane allocation and opposed such an increase sought by OGS, were protected by the privilege of inducing governmental action recognized in *Eastern Railroad Presidents Conference v. Noerr Motor Freight Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961).

OGS rejects all of Gasco's contentions, and the issues have been both well briefed and well argued. In fact, both when and after the motion to dismiss was filed, the parties filed numerous memoranda, exhibits and tables to aid the Court in the determination of the issues. Since these are matters outside the pleadings which have not been excluded by the Court, I must and do treat this motion as a motion for summary judgment made pursuant to Rule 56 of the Civil Rules. Fed.R.Civ.P. 12(b); *Smith v. United States,* 362 F.2d 366 (9th Cir. 1966).

## II. MOTION TO DISMISS

## A. THE HAWAII GAS INDUSTRY

Before beginning an analysis of the legal issues raised by Gasco's dismissal motion, it is necessary to examine the Hawaii gas industry and market to define the context in which these issues arise. This is especially necessary where, as here, the complaint alleges monopolistic and other anticompetitive conduct. The following description of the Hawaii gas industry emerges from the pleadings and memoranda on file.

LP-gas, commonly called propane, is a compressed liquid gas which is a mixture of liquid hydrocarbons containing primarily the chemical propane ($C_3H_8$). LP-gas is extensively used as a fuel for industrial, commercial, agricultural and residential purposes. Propane may be produced by refining crude oil or may be recovered by precipitating liquid hydrocarbons out of the "wet gas" flowing from natural gas wells. All of the propane marketed by plaintiff OGS and a large quantity of the propane marketed by defendant Gasco is refined in Hawaii by Chevron, U.S.A., Inc. ("Chevron"), from oil imported from foreign sources or from states other than Hawaii. Gasco also purchases some LP-gas directly from foreign sources.

LP-gas is distributed in Hawaii by either a non-utility or utility method. Non-utility LP-gas is distributed by tank trucks to tanks rented from the supplier and installed on the customer's premises. Utility LP-gas is distributed by separate networks of pipelines called rural utility systems. Each rural utility system consists of a central storage site from which metered pipelines carry LP-gas to users within the system. Rural utility systems, unless entirely contained within private property, are regulated by the Hawaii PUC.[4]

Gasco and OGS are currently the only wholesale purchaser-resellers of LP-gas in the State of Hawaii.[5] Before OGS began its operations in December of 1972, Gasco was the sole supplier of LP-gas in the state. Now, OGS alleges (upon information and

---

**3.** Gasco also argues that implied repeal of the antitrust laws is necessary to allow the regulatory scheme achieve its objectives.

**4.** The Commission regulates these systems pursuant to Haw.Rev.Stat. § 269–1 *et seq.*

**5.** The term "wholesale purchaser-reseller" is defined in the petroleum allocation regulations as "any firm which purchases, receives through transfer, or otherwise obtains (as by consignment) an allocated product and resells or otherwise transfers it to other purchasers without substantially changing its form." 10 C.F.R. § 211.51.

belief), Gasco owns and operates at least 39 rural utility systems in Hawaii. OGS serves but one such system, supplying a single, privately-owned subdivision on Oahu. OGS has also alleged that in 1976 Gasco generated about $12,000,000 in total revenues from its LP-gas distribution. This figure is claimed to represent in excess of ninety-five percent (95%) of the LP-gas market in Hawaii.

Gasco also sells synthetic natural gas to customers on the island of Oahu. SN-gas is a gas fuel which, for all practical purposes, is used interchangeably with LP-gas as a source of fuel.[6] SN-gas is distributed in gaseous form by pipeline directly to customers. OGS does not distribute SN-gas, but has alleged that Gasco's allegedly illegal activities also affected the SN-gas market to OGS's detriment.

■ This, then, is the field from which the battle has moved into the courts. Hoping to deflect OGS's volley of antitrust claims, Gasco has raised the shield of antitrust immunity. To determine the validity of that defense, I now consider the merits of Gasco's dismissal motion.[7]

## B. ANTITRUST IMMUNITY DUE TO FEDERAL REGULATION

### 1. *Blanket Immunity For Activities Relating to LP-Gas*

Gasco argues that all of the challenged activities related to LP-gas are exempt from judicial scrutiny due to pervasive federal regulation which has impliedly repealed the antitrust laws. This pervasive regulation, it is argued, evidences a congressional intent to supplant the antitrust laws in order to effect the policies of the regulatory program. Gasco also contends that an implied immunity from the antitrust laws is necessary to make the regulatory scheme work.

6. SN-gas is chemically identical to natural gas. It is called "synthetic" natural gas because it is manufactured rather than recovered from gas wells. Gasco's SN-gas is manufactured from a naptha-based feedstock.

7. Except in the limited instance hereafter discussed, the doctrine of primary jurisdiction is not applicable in the instant case. Although in

As noted in *Phonotele, Inc. v. American Telephone and Telegraph Company,* 435 F.Supp. 207, 210 (C.D.Cal.1977),

[t]he goals of the regulatory laws and antitrust statutes often are in conflict. The former usually are predicated on the assumption that unrestrained interaction of competitive forces in a particular industry will disserve the public interest; while the latter are founded on the premise that such unrestrained interaction will yield the best allocation of economic resources.

The problem is not a new one, and the Supreme Court cases have laid down certain well-established guidelines.

■ Initially, I note the oft-repeated caution that repeal of the antitrust laws by implication from regulatory statutes are strongly disfavored and not casually to be inferred. *E.g., Carnation Co. v. Pacific Westbound Conference,* 383 U.S. 213, 217–18, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966); *California v. Federal Power Commission,* 369 U.S. 482, 485, 82 S.Ct. 901, 8 L.Ed.2d 54 (1962). Such repeals have been found only where there is a "plain repugnancy" between the antitrust and regulatory provisions, *United States v. Philadelphia National Bank,* 374 U.S. 321, 350–51, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963); *United States v. Borden Co.,* 308 U.S. 188, 197–206, 60 S.Ct. 182, 84 L.Ed. 181 (1939), and even where such a plain repugnancy exists, the antitrust laws only give way to the regulatory scheme *pro tanto* to the extent of the repugnancy. *Georgia v. Pennsylvania R. R.,* 324 U.S. 439, 457, 65 S.Ct. 716, 84 L.Ed. 1051 (1945). Furthermore, repeal is to be regarded as implied only if necessary to make the regulatory scheme work, and even then, only to the minimum extent necessary. The proper approach is an analysis which *reconciles* the operation of both statutory

some cases the courts may defer to the regulatory agency involved in order to take advantage of its special expertise, *Ricci v. Chicago Mercantile Exchange,* 409 U.S. 289, 93 S.Ct. 573, 34 L.Ed.2d 325 (1973), the question of antitrust immunity is a question ultimately to be decided by the courts. *Gordon v. New York Stock Exchange Inc.,* 422 U.S. 659, 686, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975).

schemes with one another rather than holding one completely ousted. *Silver v. New York Stock Exchange,* 373 U.S. 341, 357, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963).

■ These general legal guidelines suggest that the analytical strategy of a court faced with the antitrust immunity issue should be as follows: first, the court must determine whether there is a conflict amounting to a "plain repugnancy" between the regulatory scheme and the antitrust laws regarding the conduct at issue; then, given the requisite repugnancy, the court must decide how Congress intended that the conflict be resolved. *See Essential Communications Systems, Inc. v. American Telephone & Telegraph Co.,* 446 F.Supp. 1090 (D.N.J.1978). Accordingly, I now examine the regulatory scheme in the present case.

(a) *Federal Regulation of Propane*

Economic Stabilization Act of 1970

Emergency Petroleum Allocation Act of 1973

Federal Energy Administration Act of 1974

Energy Policy and Conservation Act of 1975

Department of Energy Organization Act of 1977

(i) Economic Stabilization Act of 1970

The first controls to be established over the petroleum industry as a separate entity were promulgated pursuant to the Economic Stabilization Act of 1970 ("ESA")[8] which was enacted on August 15, 1970. The ESA authorized the President to "issue such orders and regulations as he deem[ed] appropriate . . . to stabilize prices, rents, wages and salaries . . .." *Id.* By March 8, 1973, the Cost of Living Council ("CLC"), which administered the pricing regulations, had announced that the larger firms in the oil industry would be subject to mandatory controls on overall profits. Toward the end of the multi-phased approach taken under the ESA, the CLC issued mandatory petroleum price controls. *See* 6

C.F.R. Part 150, subpart L, 38 Fed.Reg. 22,538 (1973). A mandatory propane allocation program was inaugurated effective October 2, 1973, apparently as a result of concerns relating to impending heating fuel shortages during fall and winter of 1972–73. *See* 38 Fed.Reg. 27,397 (Oct. 3, 1973).

The Arab Oil Embargo, which began on October 17, 1973, highlighted the need for further legislation to deal with the general shortage of petroleum products besides propane and resulted in further congressional action.

(ii) Emergency Petroleum Allocation Act of 1973

The next relevant statutory enactment was the Emergency Petroleum Allocation Act of 1973 ("EPAA"),[9] codified in 15 U.S.C. § 751 *et seq.* (1973), which was enacted on November 27, 1973. The EPAA was designed to deal with the shortages and dislocations in the petroleum distribution system brought about, in part, by the refusal of the major oil companies to follow a voluntary program aimed at sharing the supplies of scarce energy resources, H.R. Rep. No. 93–531, 93d Cong., 1st Sess., *reprinted in* [1973] U.S. Code Cong. & Ad. News, pp. 2582, 2587, and "was intended as a comprehensive scheme for regulation of all fuel to replace the limited authority of the Stabilization Act." *Mobil Oil Corp. v. Federal Energy Administration,* 566 F.2d 87 (Temp.Emer.Ct.App.1977).

The EPAA gave the President the specific, temporary authority to deal with the fuel shortages in their national distribution system by promulgating regulations which would provide for mandatory allocation of petroleum products, together with price controls. The statutory provision which defines this mandatory program is 15 U.S.C. § 753. The regulations promulgated pursuant to section 753 are found in 10 C.F.R. Parts 211 (Mandatory Petroleum Allocation Regulations) and 212 (Mandatory Petroleum Price Regulations).

Section 753 contains subparts (a) through (e), the first three of which are pertinent to

---

8. Pub.L. No. 91–379, § 201 *et seq.,* 84 Stat. 796, 799–800 (1970).

9. Pub.L. No. 93–159, § 101 *et seq.,* 87 Stat. 627 (1973).

the discussion herein. Subpart (a) directs the President to promulgate regulations providing for mandatory allocation of crude oil, residual fuel oil and refined petroleum products, specifying amounts and prices. These regulations are, "to the maximum extent possible" to adhere to a set of nine objectives, set forth in subpart (b).[10] These objectives include "economic efficiency" and "minimization of economic distortion, inflexibility, and unnecessary interference with market mechanisms." 15 U.S.C. § 753(b)(1)(H) and (I).

Subpart (b) authorized the President to set prices or "prescribe the manner for determining them." 15 U.S.C. § 753(b)(2). In specifying prices, the President is directed to provide for a dollar-for-dollar pass-through of net cost increases "at all levels of distribution from the producer through the retail level," subject to certain limitations. 15 U.S.C. §§ 753(b)(2)(A) and 753(b)(2)(B).

Subpart (c) of § 753 provides that the program shall be structured so as to result in allocation of each crude oil and refined product to independent marketers and re- finers in an amount not less than what was supplied to each marketer or refiner during the corresponding period in 1972, with certain adjustments.

The allocation regulations promulgated by the FEA pursuant to § 753 are contained in 10 C.F.R. § 211. For each type of covered product, the agency provided for allocation levels and the method of allocation, adjusted supplier/purchaser relationships, and covered certain other subjects. In the case of propane, each supplier was obliged to supply and maintain his relationship with all wholesale purchaser-resellers, wholesale purchaser-consumers, and end-users according to the preregulation base period supply relationship pattern. 10 C.F.R. § 211.85, *incorporating* 10 C.F.R. § 211.9–13.

The price regulations promulgated by the FEA pursuant to 15 U.S.C. § 753(b)(2) are contained in 10 C.F.R. Part 212. Those regulations prescribed the maximum prices sellers of covered products could charge, tying these maximum prices to May 15, 1973 lawful selling prices plus a dollar-for-dollar pass-through of the amount by which sellers' product costs have increased since that time. The regulations also provide

---

**10.** These nine objectives, which are contained in 15 U.S.C. § 753(b)(1)(A)–(I), are as follows:

(b)(1) The regulation under subsection (a) of this section, to the maximum extent practicable, shall provide for—

(A) protection of public health (including the production of pharmaceuticals), safety and welfare (including maintenance of residential heating, such as individual homes, apartments and similar occupied dwelling units), and the national defense;

(B) maintenance of all public services (including facilities and services provided by municipally, cooperatively, or investor owned utilities or by any State or local government or authority, and including transportation facilities and services which serve the public at large);

(C) maintenance of agricultural operations, including farming, ranching, dairy, and fishing activities, and services directly related thereto;

(D) preservation of an economically sound and competitive petroleum industry; including the priority needs to restore and foster competition in the producing, refining, distribution, marketing, and petrochemical sectors of such industry, and to preserve the competitive viability of independent refiners, small refiners, nonbranded independent marketers, and branded independent marketers;

(E) the allocation of suitable types, grades, and quality of crude oil to refineries in the United States to permit such refineries to operate at full capacity;

(F) equitable distribution of crude oil, residual fuel oil, and refined petroleum products at equitable prices among all regions and areas of the United States and sectors of the petroleum industry, including independent refiners, small refiners, nonbranded independent marketers, branded independent marketers, and among all users;

(G) allocation of residual fuel oil and refined petroleum products in such amounts and in such manner as may be necessary for the maintenance of, exploration for, and production or extraction of—

(i) fuels, and

(ii) minerals essential to the requirements of the United States,

and for required transportation related thereto;

(H) economic efficiency; and

(I) minimization of economic distortion, inflexibility, and unnecessary interference with market mechanisms.

that that portion of the price which represents a "May 15, 1973 selling price" is, with respect to each product sold to each buyer, a weighted average price 'at which the item was lawfully priced in transactions with the class of purchaser concerned, on the May 15, 1973 date. 10 C.F.R. §§ 212.82(b) and 212.-93(a). Sellers were thus required to maintain a single lawful price for a product to all customers who fell into a particular class, rather than having to establish individual maximum lawful prices to individual customers.[11]

The administration and enforcement provisions of the EPAA were codified in 15 U.S.C. § 754 (1973). Section 754 incorporated certain administrative and enforcement provisions of the ESA, including §§ 208 and 210, which relate to sanctions and suits for damages or other relief, respectively. Section 208 of the ESA provided for a maximum criminal fine of $5,000 for each willful violation of the Act, and a maximum civil penalty of $2,500 for each violation. The FEA regulations promulgated under the EPAA's incorporating provision contained like sanctions. 10 C.F.R. § 205.202, 39 Fed. Reg. 35,506 (Oct. 1, 1974). The regulations specifically provided that those penalties and sanctions were "cumulative and not mutually exclusive." 10 C.F.R. § 205.-202(a)(1), 39 Fed.Reg. 35,506 (Oct. 1, 1974).

---

**11.** See FEA Ruling 1975–2, 40 Fed.Reg. 10,655 (March 7, 1975), *reprinted in* 10 C.F.R. at 452.

**12.** As originally enacted by the EPAA, 15 U.S.C. § 755(c) provided in its entirety:

(c)(1) Except as specifically provided in this subsection, no provisions of this chapter shall be deemed to convey to any person subject to this Act immunity from civil or criminal liability, or to create defenses to actions, under the antitrust laws.

(2) As used in this subsection, the term "antitrust laws" includes—

(A) the Act entitled "An Act to protect trade and commerce against unlawful restraints and monopolies", approved July 2, 1890 (15 U.S.C. 1 *et seq.*);

(B) the Act entitled "An Act to supplement existing laws against unlawful restraints and monopolies, and for other purposes", approved October 15, 1914 (15 U.S.C. 12 *et seq.*);

(C) the Federal Trade Commission Act (15 U.S.C. 41 *et seq.*);

(D) sections 73 and 74 of the Act entitled "An Act to reduce taxation, to provide reve-

Section 210 of the ESA provided in subsection (a):

§ 210. Suits for damages or other relief

(a) Any person suffering legal wrong because of any act or practice arising out of this title, or any order or regulation issued pursuant thereto, may bring an action in a district court of the United States, without regard to the amount in controversy, for appropriate relief, including an action for a declaratory judgment, writ of injunction (subject to the limitations in section 211), and/or damages.

Subsection (b) provided for a discretionary award of treble damages in cases involving overcharges (charges for rental of property or sale of goods or services, which exceeded the statutory maximum established by the ESA).

In 15 U.S.C. § 755 (1973), the EPAA provided for the impact of the EPAA on other laws, specifically addressing the possible conflict with the antitrust laws by stating in subsection (c)(1):

(c)(1) Except as specifically provided in this subsection, no provision of this Act shall be deemed to convey to any person subject to this Act immunity from civil or criminal liability, or to create defenses to actions, under the antitrust laws.[12]

---

nue for the Government, and for other purposes", approved August 27, 1894 (15 U.S.C. 8 and 9); and

(E) the Act of June 19, 1936, chapter 592 (15 U.S.C. 13, 13a, 13b, and 21a).

(3) The regulation promulgated under section 753(a) of this title shall be forwarded on or before the date of its promulgation to the Attorney General and to the Federal Trade Commission, who shall, at least seven days prior to the effective date of such regulation, report to the President with respect to whether such regulation would tend to create or maintain anticompetitive practices or situations inconsistent with the antitrust laws, and propose any alternative which would avoid or overcome such effects while achieving the purposes of this chapter.

(4) Whenever it is necessary, in order to comply with the provisions of this chapter or the regulation or any orders under section 753 thereof, for owners, directors, officers, agents, employees, or representatives of two or more persons engaged in the business of producing, refining, marketing, or distribut-

The FEA regulations promulgated pursuant to subsection (c) tracked the statutory language, providing an identically limited immunity. 10 C.F.R. §§ 210.71–210.77, 39 Fed.Reg. 35,509 (Oct. 1, 1974).

(iii) Federal Energy Administration Act of 1974

The Federal Energy Administration Act of 1974 ("FEAA"),[13] codified in 15 U.S.C. § 761 et seq. (1974), was enacted on May 7, 1974 for the "sole purpose of . . . creat[ing] an administration of the executive branch, called the Federal Energy Administration . . . ." 15 U.S.C. § 761. The FEAA vested in the FEA certain functions, and transferred to that agency certain executive functions in order to effect a consolidation of theretofore scattered powers and functions under auspices of a single agency.

The Act directed the Administrator of the FEA to perform twelve specific functions and purposes, one of which was to "promote stability in energy prices to the consumer, promote free and open competition in all aspects of the energy field, prevent unreasonable profits within the various segments of the energy industry, and promote free enterprise." 15 U.S.C. § 764(b)(5). In administering any pricing authority, the Administrator was required to provide by rule for equitable allocation

of all component costs of producing propane gas. 15 U.S.C. § 764(b)(11).

(iv) Energy Policy and Conservation Act of 1975

The Energy Policy and Conservation Act of 1975 ("EPCA"),[14] codified in 42 U.S.C. § 6201 et seq. (1975), 15 U.S.C. § 757 et seq. (1975), and 15 U.S.C. § 792 (1975), which became effective on December 15, 1975, was "directed to the attainment of the collective goals of increasing domestic supply, conserving and managing energy demand, and establishing standby programs for minimizing this nation's vulnerability to major interruptions in the supply of petroleum imports." H.R. Rep. No. 94–340, 94th Cong., 1st Sess., reprinted in [1975] U.S. Code Cong. & Ad.News, pp. 1762, 1763. Among the purposes specified in the Act was the increasing of the supply of fossil fuels in the United States through price incentives and production requirements, 42 U.S.C. § 6201(3), and the conservation of energy supplies through energy conservation programs, and, where necessary, the regulation of certain energy uses. 42 U.S.C. § 6201(4).

The EPCA established a statutory price ceiling for all domestic crude oil production, thereby extending price controls to sectors of production formerly unregulated by the

---

ing crude oil, residual fuel oil, or any refined petroleum product to meet, confer, or communicate in such a fashion and to such ends that might otherwise be construed to constitute a violation of the antitrust laws, such persons may do so only upon an order of the President (or of an officer or agency of the United States to whom the President has delegated authority under section 754(b) of this chapter); which order shall specify and limit the subject matter and objectives of such meeting, conference, or communication. Moreover, such meeting, conference, or communication shall take place only in the presence of a representative of the Antitrust Division of the Department of Justice, and a verbatim transcript of such meeting, conference, or communication shall be taken and deposited, together with any agreement resulting therefrom, with the Attorney General and the Federal Trade Commission, where it shall be made available for public inspection.

(5) There shall be available as a defense to any action brought under the antitrust laws, or for breach of contract in any Federal or

State court arising out of delay or failure to provide, sell, or offer for sale or exchange crude oil, residual fuel oil, or any refined petroleum product, that such delay or failure was caused solely by compliance with the provisions of this chapter or with the regulation or any order under section 753 of this chapter.

(6) There shall be available as a defense to any action brought under the antitrust laws arising from any meeting, conference, or communication or agreement resulting therefrom, held or made solely for the purpose of complying with the provisions of this chapter or the regulation or any order under section 753 thereof, that such meeting, conference, communication, or agreement was carried out or made in accordance with the requirements of paragraph (4) of this subsection.

13. Pub.L. No. 93–275, § 2 et seq., 88 Stat. 97 (1974).

14. Pub.L. No. 94–163, § 1 et seq., 89 Stat. 871 (1975).

EPAA. The "Oil Pricing Policy" provision of the EPCA, 15 U.S.C. § 757, essentially established price ceilings ranging between an average of $7.50 to $8.50 per barrel for all classifications of domestic production, and further provided for a phase-out of then-existing price controls over a five-year period.[15]

The FEA regulations promulgated under 15 U.S.C. § 757 are contained in 10 C.F.R. Part 212. The relevant regulations establish price rules for each of three levels in the petroleum production and distribution system: producers of crude oil, refiners, and resellers and retailers.[16] For producers, the price ceiling for any first sale of domestic crude oil is pegged, with an exception contained in 10 C.F.R. § 212.74, at the highest posted price as of May 15, 1973. 10 C.F.R. § 212.73. Similarly, refiners and retailers/resellers are required to charge a price no higher than that prevailing on May 15, 1973. 10 C.F.R. §§ 212.82, 212.83, 212.91 and 212.92.

The EPCA amended the EPAA to provide stiffer criminal and civil fines. 15 U.S.C. § 754(a)(3) (1975). The EPCA further amended the EPAA by deleting those portions of the enforcement provisions which expressly stated that no portion of the EPAA conferred any immunity under the antitrust laws.[17] 15 U.S.C. § 755(c) (1975) (amending 15 U.S.C. § 755(c) (1973)). The FEA conformingly amended its regulations by revoking 10 C.F.R. §§ 210.71–210.-77, which were the regulations implementing the old EPAA limited immunity provisions.[18]

### (v) Department of Energy Organization Act of 1977

On August 4, 1977, the Department of Energy Organization Act ("DOEOA"),[19] codified in 42 U.S.C. § 7101 et seq. (1977), created the Department of Energy ("DOE") and consolidated the various major federal energy programs under that agency. The FEA was placed under the DOE, with some

---

**15.** Part (a) of § 757 specifies a ceiling price for the "first sale" of crude oil of not over $7.66 per barrel. The first sale price was the price charged in the first transfer for value by the producer or royalty owner, which transfer usually occurs at or near the wellhead. S. Conf. Rep. No. 94–516, 94th Cong., 1st Sess., reprinted in [1975] U.S. Code Cong. & Ad.News, pp. 1762, 1956; see also 10 C.F.R. § 212.-72(c)(2)(B)(2). The President was empowered in part (b) of § 757 to set different ceiling prices for different classifications of crude oil produced in the United States, subject to certain findings of justification. Part (c) provides that the President shall make a determination within six months of the statute's effective date, whether actual first sale prices exceeded or were less than the price specified in part (a) and to make appropriate amendments to the regulations. Part (d) provides for certain adjustments to the first sale price based on GNP deflator and on production incentives. Parts (e) through (g) are reporting provisions, and part (h) a limitation on judicial review.

**16.** Section 212.31 of 10 C.F.R. provides the following definitions:

"Producer" means a firm or that part of a firm which produces crude oil or natural gas, or any firm which owns crude oil or natural gas when it is produced.

"Refiner" means a firm (other than a reseller or retailer) or that part of such a firm which refines covered products or blends and substantially changes covered products, or refines liquid hydrocarbons from oil and gas field gases, or recovers liquefied petroleum gases incident to petroleum refining and sells those products to resellers, retailers, reseller-retailers or ultimate consumers. "Refiner" includes any owner of covered products which contracts to have those covered products refined and then sells the refined covered products to resellers, retailers, reseller-retailers or ultimate consumers.

"Reseller" means a firm (other than a refiner or retailer) or that part of such a firm which carries on the trade or business of purchasing covered products, and reselling them without substantially changing their form to purchasers other than ultimate consumers.

"Reseller-retailer" means a firm (other than a refiner) or that part of such a firm which carries on the functions of both a reseller and retailer.

"Retailer" means a firm (other than a refiner or reseller) or that part of such a firm which carries on the trade or business of purchasing covered products and reselling them to ultimate consumers without substantially changing their form.

**17.** See note 12 supra.

**18.** 41 Fed.Reg. 1487 (Jan. 5, 1976).

**19.** Pub.L. No. 95–91, § 101 et seq., 91 Stat. 567 (1977).

of the FEA's functions being assigned to the Federal Regulatory Commission and some to the Economic Regulatory Administration, both of which agencies are components of the DOE.[20]

(b) *Industry-wide and "sector" immunity*

It is evident from the foregoing survey of federal statutes and regulations that the heart of the regulatory scheme is embodied in the provisions of the EPAA and the EPCA amendments thereto (hereinafter collectively referred to as "EPAA," unless specific reference to either statute is made), together with the regulations promulgated pursuant to those statutes. Gasco claims that by these enactments Congress has created a pervasive regulatory program intended to preempt the antitrust laws, and that a "blanket" antitrust immunity or exemption must therefore be implied.[21] I now examine Gasco's immunity defense as it applies to industry-wide, "sector," and specific immunity. The initial inquiry in the analysis of this issue is: are these regulatory provisions "plainly repugnant" to the antitrust laws whose scrutiny is invoked by the allegations of the Complaint? OGS has complained that Gasco conspired to and did in fact intentionally monopolize trade and commerce in LP-gas and SN-gas by entering into various arrangements, combinations and contracts with its customers. The allegedly illegal activities involved include (a) Gasco's installation of appliances and facilities in exchange for the customer's agreement to deal exclusively with Gasco; (b) direct cash payments or rebates as inducements to enter into such agreements; (c) unwarranted price discrimination between purchasers of LP-gas of a like grade; and (d) misrepresentation of facts in allocation hearings before the FEA. These activities are alleged to be violations of the federal and state antitrust and trade regulation laws barring monopolies, unreasonable restraint of trade, exclusive dealing arrangements, tying agreements and price discrimination.[22]

The EPAA and the EPCA obviously intrude into areas of the petroleum industry which, if left unregulated, would be subject only to internal market controls resulting from unrestricted competition. Congress authorized federal intervention into this marketplace to preserve competition and to assure an equitable distribution of critically short supplies only when it determined that "[the petroleum products] shortages are real, severe, and cannot be dealt with through reliance on a free market structure or voluntary programs." H.R.Rep. No. 93–531, 93d Cong., 1st Sess., *reprinted in* [1973] U.S.Code Cong. & Ad.News 2582, 2583. The resulting regulatory scheme, however, is limited both in time and in scope.

As the statutory language and legislative history of the EPAA and EPCA indicate, *see* Parts II.B.1.a.ii and iii *supra,* "the upshot of the Allocation Act is to establish *temporary* regulation of *some* aspects of an industry, most particularly distribution." *Consumers Union of the United States Inc. v. Sawhill,* 525 F.2d 1068, 1080 (Temp.Ct. Emer.App.1975) ("Consumers Union") (emphasis in original). The pricing regulations included in the EPAA were included for the important but limited purpose of preventing price discrimination or price gouging which might otherwise occur due to the shortages of petroleum products. H.R. Conf. Rep. No. 93–628, 93d Cong., 1st Sess., *reprinted in* [1973] U.S.Code Cong. & Ad. News, *supra* at 2702. The EPCA, which amended the EPAA, did not expand the scope of its predecessor enactment to completely regulate all areas of the petroleum industry. The EPCA merely filled some gaps in the pricing regulations left by the EPAA by extending those regulations to sectors of production formerly unregulated.

---

**20.** *See* 42 U.S.C. § 7112(12). The legislative history of the DOEOA may be found in H.R. Conf.Comm.Rep. No. 95–539, 95th Cong., 1st Sess., *reprinted in* [1977] U.S.Code Cong. & Ad.News 854.

**21.** Gasco claims that this pervasive regulatory scheme existed throughout the applicable limi-

tations period. Section 4(b) of the Clayton Act, 15 U.S.C. § 15(b), establishes a four-year statute of limitation. Since the Complaint was filed on November 4, 1977, the period extends from November 4, 1973 to the date of that filing.

**22.** *See* note 2 *supra.*

Thus, while there may be areas of the petroleum industry which are regulated to such an extent that immunity for those areas ("sector" immunity) or for specific activities within those areas ("specific" immunity) may be warranted, the regulatory scheme, taken as a whole, cannot be said to be so plainly repugnant to the antitrust laws so as to prevent an antitrust court from scrutinizing any aspect of the industry.

Furthermore, even assuming *arguendo* that there is a conflict between the regulatory scheme and the antitrust laws amounting to a plain repugnancy, I do not find that the regulations completely oust the antitrust laws such that an industry-wide immunity can be implied. Activities which come under the jurisdiction of a regulatory agency nevertheless may be subject to scrutiny under the antitrust laws, *Otter Tail Power Co. v. United States,* 410 U.S. 366, 372, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973) (*"Otter Tail"*), and whether conduct Congress has made subject to administrative regulation is exempt from the antitrust laws depends upon Congress' intent.[23]

Such intent may be found, or not, from a variety of sources: the statutory language itself, the legislative history of the regulatory scheme in question, the pervasive nature of the regulatory scheme on its face or in continuous practice and supervision,[24] an irreconcilable conflict between regulation and the operation of the antitrust laws,[25] the inclusion and relative weight of competitive concerns in the statutory standards to be applied by the agency,[26] and primary anticompetitive effect of the behavior in question on the regulated

industry along with industry expertise and incentive to exercise its authority. *International Telephone and Telegraph Corporation v. General Telephone & Electronics Corporation,* [1978–1] *Trade Cases* ¶ 61,913 at 73,848 & n.11 ("GTE")(footnotes added).

Gasco claims a blanket immunity on the ground that the regulatory scheme as applied to the challenged activities is so pervasive as to imply a legislative intent to create an administrative substitute for antitrust enforcement.[27] Gasco also contends that the given regulation is so necessary to the objectives of the regulatory scheme as a whole as to imply that Congress intended to repeal the antitrust laws to the extent that their application would frustrate the general regulatory purpose.[28]

In support of its blanket immunity argument, Gasco relies upon two of the Supreme Court's more recent decisions granting such immunity, *Gordon v. New York Stock Exchange,* 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975) (*"Gordon"*), and *United States v. National Association of Securities Dealers,* 422 U.S. 694, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975) (*"NASD"*). In *Gordon,* the Supreme Court unanimously held that fixed commission rates charged by stockbrokers at the direction of the stock exchanges were sufficiently and specifically "regulated" by the Securities Exchange Commission ("SEC") to warrant conferral of antitrust immunity for that practice. The Court upheld the commissions because the commissions were found to be an integral part of the Securities Exchange Act of 1934, thus making "[i]mplied repeal of the antitrust laws . . . necessary to make

**23.** *Mt. Hood Stages v. Greyhound Corp.,* 555 F.2d 687, 691 (9th Cir. 1977), *cert. granted on another issue,* 434 U.S. 1008, 98 S.Ct. 2370, 57 L.Ed.2d 239 (1978); *International Telephone and Telegraph Corporation v. General Telephone & Electronics Corporation,* 449 F.Supp. 1158 (D.Haw.1978).

**24.** *Pan American World Airways, Inc. v. United States,* 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963).

**25.** *E. g., Gordon v. New York Stock Exchange,* 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975).

**26.** *See United States v. National Association of Securities Dealers,* 422 U.S. 694, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975).

**27.** *See* note 24 *supra.*

**28.** *Gordon v. New York Stock Exchange,* 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975); *see also Silver v. New York Stock Exchange,* 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963).

the Exchange Act work as it was intended." *Id.* at 691, 95 S.Ct. at 2615. The Exchange Act had given the SEC clear authority to supervise the fixing of reasonable rates of commission, and although the SEC had never expressly commanded self-regulation of such rates by the exchanges, the Court noted the long history of actual and vigorous SEC oversight and approval. The concurring justices stressed that *Gordon* did *not* stand for the proposition that the mere fact that the agency has jurisdiction over the defendant's activities renders the antitrust laws inapplicable. *Id.* at 691–92, 95 S.Ct. 2598 (Douglas, J., concurring); *Id.* at 692–93, 95 S.Ct. 2598 (Stewart, J. and Brennan, J., concurring). *Gordon,* then, is in harmony with the established line of antitrust immunity cases.

*NASD,* on the other hand, is not so easily reconciled. In that case, which was decided the same day as *Gordon* and which involved some of the same issues, the Supreme Court in a close 5–4 decision held that certain activities of the defendants which resulted in restraints on secondary market transactions were immune from antitrust scrutiny because the Investment Company Act of 1940 and the Maloney Act had displaced the applicable antitrust laws. *NASD* is curious because the Court found that Congress had intended to give the final authority on these matters to the SEC, even though the SEC had never exercised its authority and had not issued any rules or regulations under the enabling provisions of the regulatory statute. Notwithstanding this fact, the majority concluded without clearly explaining the basis for its decision, that there was "pervasive" regulatory supervision into which had been incorporated a consideration of antitrust factors, and that the antitrust laws had to defer to the regulatory scheme in order to allow the latter scheme to work.

In *NASD* the Court seemed to be concerned with the *potential* conflict between antitrust and regulation, for there was certainly no actual conflict. Thus, *NASD's*

rationale is quite puzzling and the import of the decision is unclear.[29] What does seem clear, however, is that *NASD* cannot be given so expansive a reading as to discard three decades of well-established and consistent antitrust immunity precedent, for the pre-*NASD* axioms were reaffirmed in *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976) (*"Cantor"*). *Cantor* reemphasized the need for a clear repugnancy between antitrust and regulation, resulting in a *conflict* which threatens an aspect of the agency's jurisdiction which is sufficiently central to the purposes of the enabling statute so that implied repeal of the antitrust laws is necessary to make the regulatory scheme work. *Id.* at 597 & n.37.

■ The mere fact that an agency is directed to consider antitrust factors in promulgating its regulations does not alone mandate an implication of immunity. *Mt. Hood Stages v. Greyhound Corp.,* 555 F.2d 687 (9th Cir. 1977), *cert. granted on another issue,* 434 U.S. 1008, 98 S.Ct. 2370, 57 L.Ed.2d 239 (No. 77–598). Only when there is a conflict between the two regimes, and a congressional intent that the regulations supplant the antitrust laws should antitrust immunity be implied. Thus, that portion of *NASD* which refers to agency consideration of antitrust policies may be relevant to the extent that the present regulatory scheme contains regulations, founded on antitrust policies, which are in *conflict* with the antitrust laws. However, that reference in *NASD* has no applicability where Congress had enacted a regulatory program which carefully considers antitrust policies in order to *avoid* conflict between the two schemes, and the resulting regulations achieve this result.

According to decisional law, then, antitrust defendants who seek to have a court imply exemptions from regulation find themselves adrift in "an ocean of antitrust punctuated by isolated islands of implied

---

**29.** One commentator has concluded that the *NASD* decision is a "precedential bastard" which represents "a perverse distortion in the traditional antitrust immunity doctrine." Nor-

ton, *The Antitrust Immunity Doctrine and United States v. National Association of Securities Dealers: Stepping On Otter Tail,* 28 Hastings L.J. 387 (1976).

immunity." *GTE*, ¶ 61,913 at 73,849. When examined in the light of the precedential guidelines, Gasco's "pervasiveness" argument is unconvincing. The primary indicia of a pervasive regulatory scheme are (a) legislative history indicating a legislative intent to subordinate antitrust to regulatory policy; (b) duty to actively enforce a nondiscretionary antitrust standard of administrative regulation; and (c) the availability of remedial relief under the regulatory scheme commensurate with that of the antitrust laws. *See Norton, supra* note 29, at 411 & nn.153–55. Such a pervasive regulatory scheme effectively eliminates the ability of the regulated entity to exercise independent business judgment in its activities because the scope of the regulation is so extensive and its content so specific. *Essential Communication Systems, Inc. v. American Telephone & Telegraph Co.*, 446 F.Supp. 1090 (D.N.J.1978).

In the present case, although some areas of activity in the petroleum industry may be pervasively regulated, "violations of the antitrust laws other than those enumerated in the Act might be imagined." *Pan American World Airways, Inc. v. United States*, 371 U.S. 296, 305, 83 S.Ct. 476, 482, 9 L.Ed.2d 325 (1963). And while Congress recognized the need for regulation of certain aspect of the industry, "the EPAA . . . contemplates that . . . free market forces shall be permitted to function wherever such functioning will not undermine the attainment of regulatory goals." *Inter City Oil Co. v. Murphy Oil Corp.*, [1976–1] *Trade Cases* ¶ 60,948 at 69,-175 (D.Minn. June 25, 1976) ("Inter City Oil").[30] Thus, the FEA cannot enforce nondiscretionary antitrust standards of administrative regulation in all aspects of the industry.

Moreover, the remedial relief available under the regulatory program is not coextensive with that available under the anti-

trust laws.[31] The remedial provisions of the EPAA of 1973 empower the FEA to levy limited criminal and civil fines. The EPCA amendments raised the maximum amounts of the fines and provided for an additional, more severe fine for repeated violations. These penalties and sanctions do not limit an aggrieved party's right to seek further relief, for these sanctions are "cumulative and not mutually exclusive." 10 C.F.R. § 205.203(a)(1) (1977), *formerly* 10 C.F.R. § 205.202(a)(1) (1973).

The private right of action provided by the ESA and incorporated into the EPAA does not afford the full measure of relief obtainable under the antitrust laws, and Congress clearly did not intend that such be the case. The ESA was enacted to stabilize prices, rents, wages and salaries.[32] The remedial provisions were aimed towards providing relief for violations of the policies specifically addressed by that Act. Both the House and Senate versions of the bill addressed their remedies to violations of the price control regulations which caused legal wrong to the persons upon whom the prices were imposed. The legislative history of the portion of the ESA which authorized treble damages for overcharges illustrates the focus of the remedial provisions:

> The House bill authorized *consumers* to bring suits to recover three times the amount of the *transaction* from anyone willfully violating the price control regulations. The Senate bill contained a similar provision, but authorized suits for damages of three times the amount of the *overcharge.* The conferees agreed to the Senate provision.

H.R.Conf.Comm.Rep. No. 92–753, 92d Cong., 1st Sess., *reprinted in* [1971] U.S. Code Cong. & Ad.News, pp. 2283, 2307, 2310 (emphasis added).

When the EPAA incorporated the ESA's private right of action provision, it must be

---

**30.** In *Inter City Oil,* the Court found that while the Congressional objective of maintaining competition to the maximum extent possible consistent with the public interest may not be an overriding policy of the Act, that objective is certainly a strong policy, and that "Congress did intend that 'voluntary commercial relation-

ships' not be entirely displaced by the EPAA." *Id.,* citing *Otter Tail,* 410 U.S. at 374.

**31.** *See* Parts II.B.1(a)(ii) and (iv) *supra.*

**32.** *See* Part II.B.1(a)(i) *supra.*

presumed, of course, that that provision's policy and intent were also adopted. Thus, the corresponding provision in the EPAA provides a limited remedy designed to redress violations of the allocation and pricing provisions of that Act which injure persons within the vertical distributive chain. Nowhere in the language or history of that provision, or in the intent of either the ESA or the EPAA do I find an intent to enforce the antitrust laws through this remedial statute.

■ This conclusion is buttressed by the fact that when the EPAA adopted this provision it contemporaneously enacted 15 U.S.C. § 755(c)(1) (1973),[33] which specifically provided that the EPAA did not create any immunity from the antitrust laws, except in certain limited and enumerated instances, none of which is applicable here. The antitrust laws, and the remedies thereunder, were thus left to operate independently of the EPAA. That the EPCA later deleted the "no immunity" provision does not retroactively alter the established legislative intent and policy that the surviving remedial provision be limited in its scope. For all these reasons, I conclude that the federal petroleum regulatory program is not so pervasive as to warrant a sweeping, industry-wide, blanket immunity. Neither would it be proper to imply a blanket immunity on "necessity" grounds. The statutory language and history of the regulatory scheme evidence a clear Congressional intent to intrude as little as possible into those areas protected by the antitrust laws. Therefore, while a more focused analysis may reveal some areas of activity in the petroleum industry where implied immunity may be proper and necessary, it cannot be said at this point that the objectives of regulatory program as a whole would be frustrated unless the operation of the antitrust laws were suspended.

■ It would likewise be improper to imply a blanket immunity for those sectors of the industry into which the challenged activities fall. Those allegedly anticompetitive activities are essentially unregulated by the federal program. OGS's allegations may generally be grouped to include challenges to Gasco's pricing activities, marketing practices, and conduct in exemption/exception hearings before the FEA. Under the regulatory plan, pricing regulations do establish *maximum* prices,[34] but other than that, "it is abundantly clear that Congress specifically contemplated the use of free market prices in the regulatory scheme." *Consumers Union,* 525 F.2d at 1078. The marketing regulations do fix the relationships between suppliers and certain large purchasers,[35] but "the end-user market is essentially a freely competitive one in which a supplier's marketing or solicitation efforts can have genuine impact." *Inter City Oil,* ¶ 60,948 at 69,177. And although the FEA has promulgated regulations establishing administrative procedures for agency review of requests for exemptions or exceptions to the allocation regulations,[36] conduct in such hearings which amounts to nothing more than an attempt to interfere directly with the business relationships of a competitor may be a violation of the Sherman Act. *Eastern Railroad Presidents Conference v. Noerr Motor Freight,* 365 U.S. 127, 144, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) ("*Noerr* ").

For these reasons, as well as the aforestated alternative reasons relating to lack of the requisite repugnancy and of pervasiveness or necessity to imply immunity (which apply with equal force in this analysis), "sector" immunity must also be denied, and each specific activity alleged must be examined individually to determine whether a specific immunity should be implied.

**33.** *See* Part II.B.1(a)(ii) & note 12 *supra.*

**34.** *See* Part II.B.1(a)(iv).

**35.** 10 C.F.R. § 211.9(a)(2)(ii); FEA Ruling 1974–19, 39 Fed.Reg. 22,133 (June 20, 1974), *reprinted in* 10 C.F.R. at 434.

**36.** *See* generally 10 C.F.R. Part 205 and Part II.B.3 *infra.*

## 2. Specific Immunity

■ Although blanket immunity for the industry and for sectors thereof has been denied, a more limited immunity may nonetheless be implied in certain "specific and discrete instances," where the specific conduct at issue is specifically regulated. *NASD*, 422 U.S. at 734–35; *accord, Inter City Oil*, ¶ 60,948 at 69,182 (antitrust scrutiny is removed where conduct at issue (maximum prices) is specifically regulated by the FEA). The analytical strategy for resolving specific immunity issues is essentially identical to that employed in the blanket immunity analysis: the court must first determine whether there exists a conflict amounting to a plain repugnancy between regulation and antitrust regarding the *specific* conduct at issue; then, given the requisite repugnancy, the court must determine the congressionally-intended resolution of the conflict, all the while keeping in mind the strong judicial disfavor of implied immunity, and affinity for reconciliation rather than mutual exclusion.

■ In support of its claims of specific immunity, Gasco cites numerous FEA regulations and rulings which are said to specifically and pervasively regulate the activities alleged. Heavy reliance is placed upon 10 C.F.R. § 210.62 (1974), the "normal business practices" regulation, and to save repetitive reference to that regulation at later stages of the specific immunity analysis, a preliminary examination of the general scope and effect of § 210.62 seems to be a wise and economical prelude to an allegation-by-allegation inquiry.

Section 210.62, the entire text of which is set forth in the margin,[37] has three subsections. Subsection (a) requires suppliers to deal with purchasers of an allocated product according to "normal business practices" in effect during the applicable base period. No supplier may modify any "normal business practice" so as to result in the circumvention of any provision of the chapter.

With respect to subsection (a), Gasco claims that this provision of § 210.62 regulates most of the activities alleged in the

**37.** Section 210.62 provides:

§ 210.62 Normal business practices.

(a) Suppliers will deal with purchasers of an allocated product according to normal business practices in effect during the base period specified in Part 211 for that allocated product, and no supplier may modify any normal business practice so as to result in the circumvention of any provision of this chapter. "Summer fill" programs and other "dating" or seasonal credit programs are among the normal business practices which must be maintained by a supplier under this paragraph, if that supplier had such programs in effect during the base period. Credit terms other than those associated with seasonal credit programs are included as a part of the May 15, 1973 price charged to a class of purchaser under Part 212 of this Chapter. Nothing in this paragraph shall be construed to require suppliers to sell to purchasers who do not arrange proper credit or payments for allocated products, as customarily associated with that class of purchaser during the base period (for seasonal credit), or on May 15, 1973 (for other credit terms). However, no supplier may require or impose more stringent credit terms or payment schedules on purchasers than those in effect for that class of purchaser during the base period (for seasonal credit), or on May 15, 1973 (for credit terms).

(b) No supplier shall engage in any form of discrimination among purchasers of any allocated product. For purposes of this paragraph, "discrimination" means extending any preference or sales treatment which has the effect of frustrating or impairing the objectives, purposes and intent of this chapter or of the Act, and includes, but is not limited to refusal by a retail marketer of motor gasoline or diesel fuel to furnish or sell any allocated product due to the absence of a prior selling relationship with the purchaser, or establishment of new volume purchase arrangements where customers of retailers agree in advance to purchase in excess of normal amounts of motor gasoline or diesel fuel and thereby receive preferential treatment.

(c) Any practice which constitutes a means to obtain a price higher than is permitted by the regulations in this chapter to impose terms or conditions not customarily imposed upon the sale of an allocated product is a violation of these regulations. Such practices include, but are not limited to devices making use of inducements, commissions, kickbacks, retroactive increases, transportation arrangements, premiums, discounts, special privileges, tie-in agreements, trade understandings, falsification of records, substitution of inferior commodities or failure to provide the same services and equipment previously sold.

Complaint, thus providing immunity for those specific activities. Gasco apparently reads the words "any normal business practice" as meaning "any business practice in which a supplier normally (customarily) engaged." Such a construction would result not in a specific immunity for specific activities, but a blanket immunity for any business practice in which a supplier engaged at the time of the base period.

I decline to so interpret subsection (a) for two reasons. First, subsection (c), not subsection (a) deals with "customary" practices. Subsection (c) of § 210.62 bars any practice which constitutes a means to impose terms and conditions not "customarily" imposed upon the sale of an allocated product. That subsection lists terms and conditions which include many practices which would be violations of the antitrust laws, including some practices alleged by OGS, and the list is not exclusive. Therefore, there are some activities which Gasco may deem to be "normal" but which would be illegal under subsection (c).

Second, even assuming *arguendo* that the language of subsection (a), without more, regulates the activities here alleged (and I have held that it does not), and assuming further that the requisite repugnancy is present, I find that the intent of Congress was to allow the antitrust laws to continue to enforce its own objectives. Congress clearly intended to bar activities which would frustrate the purposes of the EPAA, not to mirror general antitrust law. Subsection (a) mandates continuance and non-modification of business practices to prevent "circumvention of any provision of *this* chapter [Chapter II–Federal Energy Administration, 10 C.F.R. Parts 202–661]." (Emphasis added). As has been heretofore discussed at length, the objectives and scope of the petroleum regulatory program are limited, and to read the simplistic language of subsection (a) as encompassing any and all business practices, legal or illegal, whether or not related to the purposes and objectives of the regulatory scheme, would be contrary to the language and intent of this particular regulation and of the regulatory scheme as a whole.

This is not to say, of course, that the FEA could not by some *specific* regulation or ruling sanction conduct which the antitrust laws would hold in disfavor, thereby presenting the court with focused and concrete specific immunity issue. In such a case the court would apply the formula for analyzing specific immunity issues to determine the existence and extent of conflict, and the intent of Congress.

■ Subsection (b) bars any form of "discrimination" among purchasers of any allocated product. "Discrimination" is defined as the extension of any preference or sales treatment which has the effect of frustrating or impairing the objectives, purposes or intent of the chapter or the Act, and a few samples of such discrimination are described in the subsection. That subsection's broad language might arguably cover any type of discrimination, but "discrimination" is defined so as to encompass the legislative intent to prevent frustration of the purposes and policies "of *this* chapter or of *the Act*." Therefore, subsection (b) cannot be read to include *any* discrimination, whether or not related to the limited purposes of the regulatory scheme. There is no immunity for discriminatory practices which do not frustrate the purposes of the EPAA; and because the legislative intent is to allow the regulatory scheme and the antitrust laws to co-exist, there is no blanket immunity for the discriminatory activities alleged. If the FEA has specifically regulated a specific activity, then the court must conduct a specific immunity analysis to see whether such immunity is warranted.

■ Subsection (c) states that any practice which constitutes a means to obtain a price higher than is permitted by the regulations in the chapter or to impose terms and conditions not "customarily" imposed upon the sale of an allocated product is a violation of the regulations. The subsection lists numerous such practices as examples of illegal conduct. OGS has not alleged that GASCO is charging prices higher than are authorized by the regulations. And, as noted above, subsection (c) bars activities which are also illegal under the antitrust

laws. Since this regulation seems to mirror the antitrust laws, there is no conflict between the schemes, and no immunity need be implied. Furthermore, the question of congressional intent must be resolved in favor or reconciliation. Though other FEA regulations and rulings on the propriety of certain specific activities may provide a conflict between regulation and the antitrust laws, this subsection *alone* does not, and without more, antitrust immunity may not be implied.

 After reviewing each of the allegations of the Complaint and the activities therein for which Gasco has claimed antitrust immunity, I have concluded that no antitrust immunity is appropriate. No such immunity is warranted because the activities alleged by OGS fall, with a few minor exceptions, into four categories, none of which provide a shield from antitrust scrutiny: (a) activities over which the FEA has no jurisdiction; (b) activities within FEA jurisdiction, but which have not been regulated by the agency; (c) activities which are regulated by the FEA in a manner that does not conflict with the antitrust laws; and (d) activities properly regulated by the FEA in a manner which overlaps with antitrust regulation, but where there is no congressional intent that the regulatory program supplant the antitrust laws.

### (a) *No Agency Jurisdiction*

Some of the activities for which Gasco seeks immunity appear to be activities over which the FEA has no jurisdiction (and which have not been regulated by the agency). Included in this category are the activities alleged in paragraphs 22(d), 22(*o*) and 38.

Paragraphs 22(d) and 38 allege that Gasco threatened to sue customers who sought to buy LP-gas from OGS; those lawsuits would be aimed at recovering unamortized portions of cash advances and installation charges extended by Gasco to those custom-

ers. The EPAA did not give the FEA the power to prevent suppliers from threatening to pursue contractual remedies. Even assuming the FEA has such power to regulate such a practice, it has not.[38]

Paragraph 22(*o*) alleges that Gasco threatened to withdraw its business from entities which also provided services to OGS, unless such entities refused to deal with OGS. This paragraph does not state whether the entities allegedly threatened by Gasco and Gasco's relationship to those entities are subject to the provisions of this regulatory program. If these entities and these relationships are *not* subject to the provisions of the EPAA and the FEA regulations, and if Gasco's relationship to these entities is not regulated, then OGS has alleged anticompetitive activity which is solely within the area of antitrust, beyond the jurisdiction of the FEA.

 If these entities and these relationships *are* subject to federal regulation, it is possible that Gasco's actions may be immunized due to such regulation. However, even assuming these entities are of a status which would subject them and Gasco's relationship to them to regulation, I find no intent in the EPAA to preempt antitrust enforcement for solicitation of refusals to deal with a competitor. In any event, summary judgment on this insufficient factual record is inappropriate.

### (b) *Agency Jurisdiction, But No Regulation*

Many of the activities for which Gasco claims immunity are or may be assumed to be within FEA jurisdiction, but these activities are not regulated by the federal scheme.[39] Included in this category are the activities alleged in paragraphs 22(a), 22(b), 22(*l*), 22(m), 22(p), 22(q), 22(s), 34 and 36.

Paragraphs 22(a), 34, and a portion of paragraph 36 allege long-term, exclusive dealing arrangements. The regulations cit-

---

**38.** For reasons already stated, § 210.62 does not confer antitrust immunity.

**39.** Activities which come under the jurisdiction of a regulatory agency nevertheless may be subject to scrutiny under the antitrust laws. *E.*

*g., Cantor v. Detroit Edison Co.,* 428 U.S. 579, 596–97 & n.36, 96 S.Ct. 3110, 49 L.Ed.2d 1114 (1976); *Otter Tail Power Co. v. United States,* 410 U.S. 366, 372, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973).

ed by Gasco, which include various provisions of Part 211 of 10 C.F.R., do not regulate this conduct. Furthermore, even assuming that § 210.62(c) regulates this practice as one that is not "customary," that provision is in harmony with the antitrust laws.

Paragraph 22(b) and a portion of paragraph 36 allege that Gasco used rebates and cash advances to induce its customers to enter into long-term, exclusive dealing arrangements. Gasco relies upon § 210.62. For reasons already stated, § 210.62(a) does not operate to provide immunity for these allegedly anticompetitive activities.[40]

Paragraph 22(*l*) alleges that Gasco threatened outer-island retaliatory price increases against customers who changed their business from Gasco to OGS. Although the FEA does have the power to control certain aspects of petroleum pricing, this particular activity is unregulated by any specific regulatory provision. Insofar as § 210.62(c) may be read to bar this activity, that subsection is harmonious with the antitrust laws.

Paragraph 22(m) charges that Gasco consolidated into one account the separate accounts of subsidiary companies of certain customers, for the purpose of foreclosing competition from OGS as to any of these accounts. Gasco relies upon § 210.62, but that section affords no shield from the antitrust laws, and no other regulation specifically deals with this activity.[41]

Paragraph 22(p) alleges that Gasco threatened to withdraw its outer-island services from customers who also purchased LP-gas for use on Oahu, unless these customers continued to deal with Gasco. Part 211 of 10 C.F.R. does not regulate conduct by a supplier which is aimed at restricting an end-user's choice of supplier. The end-user market is essentially a freely competitive one. *Inter City Oil*, ¶ 60,948 at 69,177. Section 210.62 is inapplicable.

Paragraph 22(q) alleges that Gasco attempted to convert certain LP-gas bulk tank customers to rural utility systems to prevent OGS from soliciting such customers for non-utility LP-gas. The paragraph alleges purely anticompetitive activity which has not been regulated.[42]

Paragraph 22(s) alleges that Gasco established and maintained unreasonably high, excessive and monopolistic prices for LP-gas where no competition existed. Gasco claims that 10 C.F.R. Part 212, the mandatory petroleum price regulations, specifically regulate this activity. Subpart F, 10 C.F.R. §§ 212.91–94 sets forth price rules which are applicable to Gasco, which is a "reseller-retailer" subject to those provisions.[43] 10 C.F.R. § 212.31.

As previously discussed, *see* Parts II.B. 1(a)ii and iii *supra*, the FEA specifically regulates maximum prices. But OGS has not alleged that Gasco has set and maintained prices above the regulatory maximums. If Gasco has priced below the established price ceilings, then its conduct is unregulated, for the FEA has not regulated pricing below maximums. *Inter City Oil*, ¶ 60,948 at 69,176. Even assuming that Gasco has set and maintained prices above the allowable limits, I find no Congressional intent to preempt antitrust enforcement and sanctions for this specific anticompetitive conduct.

(c) *Agency Regulation, But No Conflict With Antitrust Laws*

The activities alleged in part of paragraph 22(a) and in paragraphs 22(e)–(h),

---

**40.** Gasco also contends that the activities alleged in these paragraphs and in paragraphs 22(a), 22(d), 22(m), 34 and 38 involve credit terms which are regulated by § 210.62(a) and FEA Ruling 1974–10, 39 Fed.Reg. 15, 140 (May 1, 1974), *reprinted in* 10 C.F.R. at 423. Even assuming, however, that the practices alleged constitute credit terms which are regulated by FEA regulations and rulings in a manner which arguably conflicts with the antitrust laws, I find no Congressional intent to sanctify such allegedly intentionally anticompetitive activity.

**41.** *See* note 40 *supra,* for a discussion of the applicability of the regulations and ruling relating to credit.

**42.** Gasco also claims immunity for these activities under the "*Noerr-Pennington*" doctrine. *See* discussion in Part II.B.3 *infra.*

**43.** *See* note 16 *supra.*

22(n), 35, 37, and 48–50 have been regulated by the FEA, but such regulations are not in such conflict with the antitrust laws that a plain repugnancy between the two schemes exist. These paragraphs allege discriminatory practices, and Gasco claims antitrust immunity due to pervasive agency regulation pursuant to § 210.62 and various FEA rulings, most notably FEA Ruling 1975–2.[44]

Paragraph 22(a) mainly alleges long-term, exclusive dealing arrangements between Gasco and its customers, but a part of that paragraph alleges that such arrangements were discriminatory.

Paragraph 22(e) alleges discrimination in rebates and cash advances given by Gasco to certain of its customers.

Paragraph 22(f) alleges discrimination, unjustified by cost differences, in charges made for installation charges.

Paragraph 22(g) alleges discrimination, unjustified by cost differences, in prices and other terms of sale.

Paragraph 22(h) alleges that Gasco engaged in predatory pricing by drastically reducing prices charged to LP-gas customers solicited by OGS, while maintaining higher prices for other customers otherwise similarly situated. Implicit in this charge is discriminatory pricing.

Paragraph 22(n) alleges that Gasco discriminated among its customers with respect to representations of availability the different forms of LP-gas service and delivery.

Paragraph 35 alleges discrimination, without cost justification, in the amount of installation fee required to be returned by Gasco customers in the event the customer ceases to purchase LP-gas from Gasco.

Paragraph 37 alleges discrimination in the granting of cash payments, rebates and allowances to customers who were similarly situated.

Paragraph 48 is a general allegation of discrimination against thousands of Gasco customers by favoring a select group with reduced prices for like service rendered.

Paragraph 49 alleges price discrimination, unjustified by differing LP-gas requirements, in favor of customers of Gasco who were solicited by OGS, and further alleges services discrimination in favor of Gasco's large utility customers.

Paragraph 50 alleges that Gasco's monopoly position in the LP-gas and SN-gas market has enabled it to charge different prices to different customers in an attempt to maximize profits by extracting the maximum price from each user, resulting in a multiplicity of prices and special allowances from Gasco to different customers without justification.

Gasco's reliance upon § 210.62 and FEA Ruling 1975–2 is misfounded. Subsection (b) of § 210.62 does regulate discriminatory practices, but that provision bars such practices, as does the applicable antitrust law.[45] Therefore, the two schemes are not in conflict. FEA Ruling 1975–2 clarified the provisions of the pricing regulations which allowed suppliers to establish "classes of purchasers" in order to establish a single, lawful price for a product to all customers that fall into a particular class, rather than having to establish individual maximums for each customer. See 10 C.F.R. § 212.31 and the pricing regulations in 10 C.F.R. Part 212.

The pricing regulations do allow different prices to be charged to different classes of purchasers, but in cases where there exists differences in prices charged to purchasers within the same class, the FEA has specifically turned to the antitrust laws for guidance. FEA Ruling 1975–2 recognizes the continuing applicability of the antitrust laws in this area, stating:

Pricing structures in the petroleum industry, and particularly discount practices, reflect the requirements of the Robinson-Patman Act amendments to the Clayton Act, 15 U.S.C. 13, and the numerous Federal Trade Commission and federal court

---

44. *See* note 11 *supra.*

45. *See* note 2 *supra.*

decisions which have applied that Act to the petroleum industry.

10 C.F.R. at 456.

As FEA Ruling 1975–2 noted, "a principal function of the class of purchaser concept is to preserve the price distinctions among purchasers which *customarily* existed under *free market* conditions." *Id.* at 453 (emphasis added). Although the FEA assumed, for purposes of applying its pricing regulations, that all discounts and price differentials in effect on the baseline date (May 15, 1973) were permissible under the Robinson-Patman Act, whether or not a supplier was coerced by the regulatory scheme to maintain such a price differential depended upon whether the FEA determined the differential to be a "customary" one. For this determination, the FEA turned to antitrust guidelines, stating:

> FEA's class of purchaser requirements are intended to be and should be construed as being consistent with the requirements of the Robinson-Patman Act. Thus, in determining whether a price differential in effect on May 15, 1973, was a customary differential which shall be maintained with respect to a class of purchaser, FEA will take into account whether the differential in question falls into one of the categories of differentials justified under the Robinson-Patman Act.

*Id.* at 457.

█ It is apparent, then, that while the FEA has regulated the activities alleged by OGS to be discriminatory, the applicable regulations are specifically designed not to conflict with the antitrust laws. Thus, the latter laws continue to operate unabated, and antitrust immunity is unwarranted.

### (d) *Conflicting Agency Regulation, But No Congressional Intent To Supplant The Antitrust Laws*

Certain activities alleged by OGS are regulated by the FEA in a manner which results in an apparent conflict between the regulatory scheme and the antitrust law. But, while there may be a conflict amounting to the requisite "plain repugnancy," I do not find a Congressional intent to supplant the antitrust laws. Activities falling into this category are those alleged in paragraphs 22(c), 27, 28, and 29.

Paragraph 22(c) alleges that Gasco tied the sale of LP-gas to long-term contracts for the use, sale, lease or rental of tanks, bottles and other equipment. Gasco contends that this practice is specifically regulated by § 210.62 and several FEA rulings.

Although § 210.62 does not by itself result in specific regulation of this activity, the combination and interplay of that regulation and certain FEA rulings do result in specific agency regulation of this activity. Subsection (c) of § 210.62 bars any practice which is (a) a means to obtain a price higher than permitted by the regulations, or (b) to impose terms and conditions not customarily imposed upon the sale of an allocated product. Among the enumerated prohibited practices listed in § 210.62(c) are "tie-in agreements." Standing alone, then, § 210.-62(c) is in harmony with the antitrust laws which have made such tie-in agreements virtual *per se* violations of the antitrust laws. *E.g., International Salt Co., Inc. v. United States,* 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947).

█ But FEA Ruling 1975-4[46] stated that "[tie-in agreements] are not necessarily prohibited by the FEA regulations, and where the supplier has customarily imposed such requirements as a condition of the purchase of product, for example, the continuation of this practice may be permitted." This ruling permits such agreements, provided they are "customary" and are not means to obtain illegally high prices. The conflict with the antitrust standard is evident and I must determine the question of whether Congress intended to preempt the antitrust laws by implication.

With respect to this activity, I see no such intent. While the FEA has declined to

46. 40 Fed.Reg. 19,635 (May 6, 1975), *reprinted in* 10 C.F.R. at 464.

make such agreements *per se* violations of the regulatory program, neither has the agency specifically approved this conduct or required Gasco to engage in such a practice. As I concluded earlier, § 210.62(a) requires the maintenance of "normal" business practices, not "customary" business practices. And § 210.62(c) only states what a supplier *cannot* do, not what it *must* do. For this reason, as well as the aforementioned reasons relating to legislative intent, agency mandate, business judgment, and comparative remedies, *see* Part II.B.1(b) *supra,* I find no regulatory coercion imposed by pervasive regulation. Furthermore, allowing antitrust scrutiny will not frustrate the purposes of the regulatory program, which will instead benefit from the supportive vigilance of the antitrust laws.

Paragraphs 27, 28, and 29 are the charging paragraphs of Count II. The main thrust of Count II is that Gasco's business practices and reports to the FEA have distorted FEA's computation and allocation of supplies from the Chevron refinery. Gasco claims immunity for these activities, due to regulation under the various regulations requiring reporting and record-keeping for allocation regulation purposes.[47] *E.g.,* 10 C.F.R. §§ 210.91, 210.92, 211.87, 211.221–211.225.

Paragraph 27 alleges that Gasco's conduct warped and distorted the base period volume·attributable to OGS, thereby preventing OGS from receiving the full measure of LP-gas allocation it would have received but for the challenged conduct.

Paragraph 28 alleges that Gasco sought and received from the FEA an increase in its monthly allocation of LP-gas, and has diligently opposed such applications by OGS.

Paragraph 29 alleges that in such hearings before the FEA, Gasco has made misrepresentations of material facts, including the true price at which Gasco obtains foreign LP-gas. Such misrepresentations are alleged to further warp and distort the agency decision-making process with respect to LP-gas allocations to OGS and Gasco.

It is obvious from preceding discussions of the regulatory program in question that there is extensive federal regulation of petroleum products such as propane. Indeed, this was the single most important objective of the federal scheme, which was a result of the extreme actual and threatened shortages of energy sources, especially fossil fuels. The mandatory petroleum allocation regulations contained in Part 211 of 10 C.F.R. fixed certain supplier-purchaser relationships, and established rules for allocation of petroleum products throughout the vertical distributive chain.

The FEA was empowered to permit exemptions or exceptions to these allocation regulations, 10 C.F.R. § 210.3, and administrative procedures for obtaining such relief from the FEA were established and are governed by 10 C.F.R. Part 205. As noted above, supplier must adhere to certain reporting and record-keeping requirements designed to assist the FEA in monitoring supply relationships.

Because these regulations extensively regulate supply relationships which would otherwise be determined by free market forces, I find that in this area there is a plain repugnancy between the regulatory scheme and the antitrust laws. The next step in the analysis is to determine how Congress intended that such a conflict be resolved.

I decline to take that step at this time. On this aspect of the case, I prefer to stay my hand until the FEA has adjudicated related factual issues, a procedure which was approved by the Supreme Court in *Ricci v. Chicago Mercantile Exchange,* 409 U.S. 289, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973) (*"Ricci"*). In *Ricci,* a broker sued the Mercantile Exchange alleging that it had violated the antitrust laws by transferring the

---

**47.** *See* note 42 *supra.*

plaintiff's membership to another broker. The Supreme Court upheld an order staying the antitrust action until related issues in the dispute were first adjudicated before the Commodity and Exchange Commission, identifying three reasons for doing so. First, the antitrust court had to determine whether the applicable statute preempted the antitrust laws. Second, some facets of the dispute between the parties were within the statutory jurisdiction of the agency. And third, the adjudication of the dispute by the agency promised to be of material aid in resolving the immunity question. *Id.* at 302.

All of those factors are present here. In addition, the parties are already before the FEA, contesting some of the very same issues raised here.[48] Thus, in this particular instance, as in *Ricci,*

> [t]he adjudication of the [agency], if it is forthcoming, will be subject to judicial review and would obviate any necessity for the antitrust court to relitigate the issues actually disposed of by the agency decision. . . . Affording the opportunity for administrative action will "prepare the way, if the litigation should take its ultimate course, for a more informed

and precise determination by the Court of the scope and meaning of the statute as applied to [these] particular circumstances."

*Id.* at 306, 93 S.Ct. at 582. (Citations omitted).

(e) *Miscellaneous Activities*

A few activities alleged defy facile classification. These activities are alleged in paragraphs 22(r), 30 and 31.

Paragraph 22(r) alleges that Gasco engaged in predatory conduct to monopolize and to foreclose competition.

Paragraph 30 alleges that Gasco purchased as much LP-gas as possible from Chevron rather from its foreign sources, or rather than modifying its own refinery to produce LP-gas, in order to restrict the amount of LP-gas available to OGS.

Paragraph 31 alleges that all of the deceptive practices alleged were engaged in by Gasco to monopolize trade and commerce in LP-gas.

With respect to the activities alleged in paragraphs 22(r) and 31, each of the specific practices alleged for which Gasco has claimed antitrust immunity has been exam-

---

**48.** On May 11, 1977, OGS applied to the FEA for exception relief, requesting that its base period use of propane be increased from 208,-333 gallons per month to 425,000 gallons per month.

On August 7, 1977, the Region IX Office of Exceptions and Appeals issued a decision and Order denying OGS's request for relief.

On September 13, 1977, OGS filed an appeal (FEA-1469) from the adverse decision with the appropriate administrative appeals body, the Office of Hearings and Appeals.

In January and February of 1978, Gasco attempted to obtain by means of a Freedom of Information Act ("FOIA") request upon the FEA, materials submitted by OGS to the agency in an ex parte hearing. Gasco also sought a stay, pending action its FOIA request. On February 7, 1978, Gasco's requests were denied by the agency.

On February 13, 1978, Gasco filed suit in the United States District Court for the Northern District of California (C78–0333 WWS), to restrain the progress of the administrative hearings and to obtain the materials earlier sought

through the FOIA request. On April 10, 1978, the District Court in the Northern District of California denied OGS's requested relief.

On September 20, 1978, the Office of Hearings and Appeals denied OGS's appeal and affirmed the August 7, 1977 Decision and Order of the Region IX Office of Exceptions and Appeals. However, the Office of Hearings and Appeals did grant OGS partial relief in the form of an allowable price increase of five cents per gallon for propane sold in Hawaii, from September 20, 1978 through November 30, 1980.

It is noteworthy that the Office of Hearings and Appeals ordered an audit and investigation of Gasco's operations to determine the validity of certain of its statements relating to pricing. Decision and Order of the Department of Energy, Case No. FEA–1469 at 15 & n. 12 (Sept. 20, 1978). The Office of Enforcement of DOE Region IX was requested to submit a report to the Office of Hearings and Appeals regarding certain aspects of Gasco's pricing practices. OGS should also raise before the Office of Enforcement the issues in the present case on which I have deferred.

ined in the light of the regulatory scheme and has been found to be subject to antitrust scrutiny. Thus, Gasco's contentions that paragraphs 22(r) and 31 must be stricken are rejected.

Paragraph 30 alleges an activity which may or may not be regulated by the FEA. If Gasco is free to choose its supplier, then its choice to purchase as much LP-gas as possible from Chevron is purely a business decision, which is subject to antitrust scrutiny. However, if Gasco is required by the regulations to maintain its relationship with Chevron, the activity challenged in paragraph 30 may be shielded from antitrust immunity.

Gasco appears to be a "wholesale purchaser-reseller," which is defined by 10 C.F.R. § 211.51 as "any firm which purchases, receives through transfer, or otherwise obtains (as by consignment) an allocated product and resells or otherwise transfers it to other purchasers without substantially changing its form." The relationship, defined by dates or imposed by the allocation regulations, between suppliers and wholesale purchaser-resellers of propane must be maintained for the duration of the Mandatory Petroleum Allocation Program and may not be waived or otherwise terminated without the express written approval of the FEA. 10 C.F.R. § 211.85, incorporating 10 C.F.R. § 211.9(a)(2)(i).

Since there is no evidence in the record to establish whether Gasco's relationship to Chevron was, at the relevant date for determining such a fact, a relationship required to be maintained under the regulations, I cannot at this time grant summary judgment on this issue. Either party may attempt to establish this fact and other facts relevant to this issue by means of a later summary judgment motion supported by competent evidence.

### 3. "Noerr-Pennington" Immunity

Gasco claims that the activities alleged in paragraphs 22(d), 22(q), 27, 28, 29, and 38 are protected by the privilege of influencing governmental action, developed in *Eastern Railroads Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) ("*Noerr*"), and *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965) ("*Pennington*"). The allegations of these paragraphs have been previously outlined.

In *Noerr,* and again in *Pennington,* the Supreme Court held that joint efforts to influence legislative and executive action do not violate the antitrust laws even where such actions are intended to eliminate competition. This doctrine was later extended to include efforts to influence administrative proceedings as well. *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972) ("*California Motor Transport*"). The policy underlying this doctrine is that such joint efforts to influence officials in the exercise of their public duties are beyond the scope of the antitrust laws, since to prohibit such activity would substantially impair the constitutional rights to associate and to petition the government. *Noerr,* 365 U.S. at 137–38, 81 S.Ct. 523; *see also Franchise Realty Interstate Corp. v. San Francisco Local Joint Executive Board of Culinary Workers,* 542 F.2d 1076 (9th Cir. 1976), *cert. denied* 430 U.S. 940, 97 S.Ct. 1571, 51 L.Ed.2d 787 (1977) ("*Franchise Realty*").

*Noerr* recognized a "sham" exception to this privilege. The exception applies where such joint action (in *Noerr,* a publicity campaign), "ostensibly directed towards influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." *Noerr,* 365 U.S. at 144, 81 S.Ct. 533. In *California Motor Transport,* the Court held that the sham exception included abuses of the administrative processes which effectively bar competitors from access to agencies and the courts. 404 U.S. at 513, 92 S.Ct. 609. Furthermore, if such actions are

not directed towards achieving a political result or affecting public policy, the *Noerr-Pennington* protections may not apply to provide insulation from the antitrust laws. *Woods Exploration & Producing Co. Inc. v. Aluminum Co. of America*, 438 F.2d 1286 (5th Cir. 1971), *cert. denied* 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1971).

■■■ Gasco is not entitled to summary judgment on the issues involved in paragraphs 27, 28 and 29 for a number of reasons. First, it is at best questionable that the activities therein alleged were directed towards achieving a political result or affecting public policy. Second, even assuming that the activities alleged were so directed, they are subject to closer scrutiny because they occurred in an adjudicatory setting. In *Pennington*, Justice Douglas noted that unethical conduct which would not result in antitrust illegality in a legislative or non-adjudicative setting *may* result in illegality in an adjudicatory setting involving administrative or judicial processes. 404 U.S. at 512–13, 92 S.Ct. 609. Among the examples enumerated by Justice Douglas were perjury, use of a patent obtained by fraud to exclude a competitor from a market, conspiracy with a licensing agency, and bribery. Most relevant to this case is the admonition that "[m]isrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process." *Id.* at 513, 92 S.Ct. at 613; *see also Metro Cable Co. v. CATV of Rockford, Inc.*, 516 F.2d 220, 228 (7th Cir. 1975).

There can be no doubt that proceeding before the FEA are adjudicatory in nature. 10 C.F.R. Part 205 establishes administrative procedures and sanctions. Procedures for exceptions and exemptions are covered in subparts D and E, respectively, of Part 205. These subparts provide that a party seeking such relief must file an application with the FEA, notify persons who may be aggrieved by the FEA action, and make a timely request for a hearing if one is desired. The FEA evaluates the application and then issues a decision and order, which may be appealed to the FEA Office of Exceptions and Appeals. Furthermore, subparts K and L authorize the FEA to issue rulings and to promulgate rules. Thus, in this setting, Gasco's alleged misconduct before the FEA is entitled to less protection than it would be if such conduct occurred in a non-adjudicatory environment.

Finally, there remain some unanswered factual questions. Is Gasco's conduct a mere sham, or an abuse of the administrative process? Did Gasco in fact make any misrepresentations? On the incomplete record before me, I cannot grant summary judgment. I can and do hold, however, that OGS has properly alleged conduct, which if proven, would invoke the exception to the *Noerr-Pennington* privilege and would expose Gasco's activities to antitrust scrutiny.[49] The factual issues which remain may be resolved by another summary judgment motion brought by either party.

■■■ With respect to paragraph 22(q), Gasco contends that its alleged attempts to

---

**49.** I am aware that in *Franchise Realty Interstate Corp. v. San Francisco Local Joint Executive Board of Culinary Workers ("Franchise Realty")*, 542 F.2d 1076 (9th Cir. 1976), *cert. denied* 430 U.S. 940, 97 S.Ct. 1090, 51 L.Ed.2d 787 (1977), the Ninth Circuit held that activities of a restaurant employer association and labor union, consisting of attempts to lobby and petition a governmental body in opposition to the granting of permits by a municipal board to the plaintiff for operation of restaurants in the city, did not violate the Sherman Act, even though the purpose of opposition was to eliminate competition. In that case, however, the alleged activities of the defendants consisted entirely of attempts to lobby and petition a governmental body which was characterized by the Court as

"as much a political as an adjudicatory body." *Id.* at 1079. Furthermore, in *Franchise Realty* the plaintiffs' complaint failed to allege specific activities, not protected by *Noerr*, which barred plaintiffs' access to a governmental body. *Id.* at 1082.

In the present case, OGS has alleged that Gasco has made misrepresentations before the FEA, an adjudicatory body, including the specific allegation that Gasco has misrepresented the true price at which Gasco obtained foreign LP-gas. If proven, these activities seem to constitute exactly the type of unethical conduct condemned by Justice Douglas in *Pennington*. 404 U.S. at 512–13, 92 S.Ct. 609.

convert bulk tank customers to rural utility systems constituted *de facto* applications for a state-granted utility, because such conversions were regulated by the Hawaii PUC. But paragraph 22(q) alleges that Gasco attempted to convert its customers, not that Gasco attempted to influence the Hawaii PUC to authorize such conversions. As alleged, this activity is not protected by the *Noerr-Pennington* privilege.

Paragraphs 22(d) and 38, which allege threatened suits to recover unamortized advances and installation charges and to recover cash payments and rebates upon early termination of business with Gasco, are claimed to be immunized by the *Noerr-Pennington* doctrine because the instigation of legal proceedings is conduct protected by that privilege. *See California Motor Transport,* 404 U.S. at 510, 92 S.Ct. 906, *Franchise Realty,* 542 F.2d at 1084. Both *California Motor Transport* and *Franchise Realty* are distinguishable from the instant case. In those cases, the legal proceedings were brought against *competitors* of the defendant claiming the privilege. For example, the Court stated in *California Motor Transport*:

> We conclude that it would be destructive of rights of association and of petition to hold that groups with common interests may not, without violating the antitrust laws, use the channels and procedures of state and federal agencies and courts to advocate their causes and points of view respecting resolution of their business and economic interests *vis-a-vis their competitors.*

404 U.S. at 510–11, 92 S.Ct. at 612 (emphasis added).

■ In the instant case, these paragraphs allege threats of lawsuits against potential *customers* of OGS for the purpose of foreclosing competition, not against OGS itself. These activities, if proven, are not protected by the *Noerr-Pennington* privilege.

## C. ANTITRUST IMMUNITY DUE TO STATE REGULATION OF LP–GAS AND SN–GAS

Although no immunity due to federal regulation is claimed for Gasco's activities as to SN-gas and rural utility propane systems, Gasco does claim that these activities are immunized from the antitrust laws by reason of the Hawaii PUC's regulation of the distribution and sale of SN-gas and rural utility systems not wholly within private property.[50] Immunity is claimed under the "state action" exemption developed in *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943).

Parker involved a challenge to a California agricultural program which was created by a state statute authorizing the establishment of agricultural marketing programs restricting competition among growers and maintaining prices. Under the statutory scheme, the growers would concertedly develop a marketing and price-fixing program and nominate an administrative committee to enforce it. A state commission was created to receive industry proposals and to conduct hearings on the proposals. If, after the hearings, the commission found that the proposal would prevent agricultural waste and would not permit producers to earn unreasonable profits, then the plan would be approved, provided a specified percentage of producers also approved the plan via a commission-supervised referendum. After one such proposal was adopted for the raisin industry, one grower sued the state officials charged with enforcing and administering the program, alleging among other changes that the state scheme was invalid under the Sherman Act.

The Supreme Court upheld the California statute, holding that Congress, in enacting the Sherman Act, did not intend to invalidate state action regulating economic activity. As the Court stated:

> the . . . program here was never intended to operate by force of individual agreement of combination. It derived its authority and its efficacy from the legislative command of the state and was not

**50.** *See* note 4 *supra.*

intended to operate or become effective without that command. We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature.

317 U.S. at 350–51, 63 S.Ct. at 313.

The Court also emphasized that the "state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful . . . (citation omitted)." *Id.* The Court emphasized that the Sherman Act is applicable to "persons," and that the *state* (via its officers and agents) was the defendant in that case.

■ The *Parker* exemption cannot be given an overly broad reading. In *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), the Supreme Court refused to apply the *Parker* doctrine to activities of a state bar association which dampened price competition among lawyers. That decision made it clear that the "state action exemption" did not cover activity which was not required by the state, acting as a sovereign. *Id.* at 790–91, 95 S.Ct. 2004. The latest definitive word on the *Parker* exemption was issued in the case of *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976).

In *Cantor*, the Court was faced with the question of whether the *Parker* rationale immunizes private action which has been approved by the state, and which must be continued while the state approval remains effective. The plaintiff was a retailer of light bulbs who complained that a tariff under which Detroit Edison gave free light bulbs to its electric power customers, billing them only for electricity consumed, created a tie-in between the light bulbs and electric power, forcing the customer to pay for both as part of their utility rates. The utility rates, including the omission of any separate charge for the light bulbs, had been approved by the Michigan Public Service Commission, and could not be changed without that body's approval.

Although the defendant utility company claimed that its tariff required it to supply the free bulbs and that the Commission's approval exempted the challenged practice from the antitrust laws, the Court rejected this argument, noting that *Parker* "plainly limited the Court's holding to official action taken by state officials." *Cantor*, 428 U.S. at 591, 96 S.Ct. at 3118. The Court pointed out that in *Parker* the defendants had been state officials and that the immunity conferred in that case protected the *regulators* rather than the *regulated*. *Cantor* was a different case because

[i]n this case [*Cantor*], unlike *Parker*, the only defendant is a private utility. No public officials or agencies are named as parties and there is no claim that any state action violated the antitrust laws.

. . . . .

Since the case now before us does not call into question the legality of any act of the State of Michigan or any of its officials or agents, it is not controlled by the *Parker* decision.

*Id.*

Furthermore, the Court concluded that private conduct does not qualify for antitrust exemption merely because it is required by state law. *Id.* at 592 & nn. 26–29, 96 S.Ct. 3118. The Court decided that the proper inquiry involved an examination of the mixture of private and public initiative and motivation in the challenged program. Although recognizing that "there may be cases in which the States' participation in a decision is so dominant that it would be unfair to hold a private party responsible for his conduct in implementing it," *id.* at 595, 96 S.Ct. at 3119, the Court found no such unfairness in that case because the program was not required by the state, was initiated by Detroit Edison, and was significantly participated in by the utility company. Therefore, Detroit Edison could be required to conform to the antitrust laws in the same manner as unregulated industries.

■ In the present case, *Parker* immunity is inappropriate because the State is not a party, nor are its agents or officers,

and no action of the state is challenged. Furthermore, the state involvement in the activities here challenged is not such as would make it unfair to hold the defendant to the standards imposed by the antitrust laws. Gasco sets its own rates subject to PUC approval.[51] Furthermore, the PUC does not regulate, approve or mandate the marketing activities of Gasco. The activities of Gasco which are challenged herein are a product of its own business judgment, subject only, in discrete areas which are not relevant here, to the Hawaii PUC's approval. It follows, then, that neither *Parker* nor *Cantor* offer the shield of immunity to Gasco for the se activities.

## III. CONCLUSION

For the foregoing reasons, Gasco's Motion to Dismiss and alternative Motion to Strike Allegations of the Complaint are denied in their entirety, except as to the issues raised in paragraphs 27, 28 and 29. I reserve my ruling on the motions insofar as those paragraphs are involved, and the portion of this action which involves those allegations is stayed pending the FEA's determination of related and relevant factual issues.

The denial of these motions does not prejudice the limited right of either party to bring another motion for summary judgment, in an attempt to resolve before trial those issues which I have specifically made subject to such a renewed motion.

An appropriate order shall issue forthwith.

---

**51.** Haw.Rev.Stat. §§ 269–11 and 16.